[No. 27792. *En Banc.* January 6, 1940.]

L. G. RAYNOR, *Respondent and Cross-appellant,* v. KING COUNTY et al., *Appellants.*[1]

[1]Reported in 97 P. (2d) 696.

*B. Gray Warner, Lloyd W. Shorett,* and *Harry A. Bowen,* for appellants.

*Weter, Roberts & Shefelman,* for respondent and cross-appellant.

JEFFERS, J.—Plaintiff, L. G. Raynor, brought this action to enjoin defendant King county from issuing general obligation bonds to fund outstanding warrants, the total amount of the principal of which is $1,919,-505.75. The complaint alleges that, at the time such warrants were issued, King county was indebted in excess of its statutory debt limit of one and one-half per cent, and was so indebted at all times since; that such warrants were not issued either for mandatory expenses or for expenditures necessary for the existence of the county; that the emergency warrants were issued when, in fact, no emergency existed.

Resolution No. 7358 is marked exhibit "A," and is attached to and made a part of the complaint. This resolution, passed by the county commissioners of King county on May 22, 1939, wherein the bond issue is authorized to fund the outstanding emergency current expense warrants involved herein, recites in part as follows, as to the warrants issued in 1936, 1937, 1938 and 1939:

"WHEREAS, King County, by resolutions duly passed by the board of county commissioners of said county on the respective dates hereinafter set forth, at meetings of the said board of county commissioners duly and regularly called and held and after due notice as required by law, by unanimous vote duly adopted and entered into their minutes resolutions in form and substance as required by law in such case finding that emergencies existed in the case of each of said resolutions for incurring indebtedness not included in the budget for 1936 [37-38-39], and duly and regularly authorized emergency current expense fund warrants of the said King County for the purposes hereinafter indicated, and in addition thereto, by competent court order and the mandatory requirements of the constitution and statutes of the state of Washington, for the performance of necessary and essential governmental duty, emergency current expense fund warrants of said county were duly issued for Mothers' Pension, Juvenile Court Probation and Care of Insane . . .

"WHEREAS, the said current expense warrants issued in the years 1936, 1937, 1938 and 1939, and described in this resolution, are all outstanding and unpaid, but all of the same are immediate and pressing obligations of the said King County payable in the order of their numbers, and said King County has no funds on hand with which to pay the same; and

"WHEREAS, no provision has been made to raise any of the money necessary to retire the said warrants, or to make good the deficit in the said current expense fund . . ."

The answer of defendant King county denied the material allegations of the complaint.

Since all of the records and other evidence was in the possession of defendants, the county assumed the burden of going forward with the proof.

The warrants in question were issued during the years 1936, 1937, 1938, and 1939. As a general basis for its contention that it had not exceeded its debt limit at the time such warrants were issued, the county introduced exhibits Nos. 2 and 8. Exhibit No. 8, as corrected, shows the assessed valuation, gross indebtedness, available assets, net indebtedness, and additional debt permissible, as of December 31, 1936. This exhibit shows:

Assessed valuation ..............................$297,665,886.00
One and one-half per cent limitation on assessed
 valuation of .................................. 4,464,975.00
Gross indebtedness .................$8,578,686.40

As to the above items in the exhibits, there is no dispute. The county then lists as available assets, which it contends it should be allowed to offset against the *gross indebtedness,* the following items:

| | |
|---|---:|
| Cash on hand.................................. | $652,734.52 |
| Estimated revenue to be collected................ | |
| Taxes receivable ............................. | 2,390,252.39 |
| Accrued interest on taxes....................... | 1,462,656.00 |
| Accounts receivable ........................... | 178,287.91 |
| Real estate subject to sale....................... | 1,558,000.00 |
| Total available assets....................... | $6,241,930.82 |
| Net indebtedness .......................... | 2,336,755.58 |
| Additional debt permissible.................. | 2,128,219.42 |

Exhibit No. 8, as corrected, also shows the assessed valuation, gross indebtedness, available assets, net indebtedness, and additional debt permissible as of December 31, 1937, as follows:

Assessed valuation ..............................$308,948,037.00
One and one-half per cent limitation on assessed
 valuation ..................................... 4,634,220.57
Gross indebtedness ..................$8,558,526.81
Available assets:
Cash on hand .................................... 235,942.80
Estimated revenue to be collected................
Taxes receivable ................................ 1,843,986.68
Accrued interest on taxes........................ 1,189,760.00
Accounts receivable ............................. 392,662.61
Real estate subject to sale...................... 1,958,000.00

 Total available assets........................ 5,620,352.09
 Net indebtedness ............................ 2,938,174.72
 Additional debt permissible.................. 1,696,045.85

Exhibit No. 2, as corrected, shows the assessed valuation, gross indebtedness, available assets, net indebtedness, and additional debt permissible as of June 30, 1939, as follows:

Assessed valuation ..............................$303,033,617.00
One and one-half per cent limitation on assessed
 valuation ..................................... 4,545,504.25
Gross indebtedness ..................$9,968,493.94
Available assets:
Cash on hand..................................... 611,009.58
Estimated revenue to be collected................ 293,324.61
Taxes receivable ................................ 1,870,257.29
Accrued interest on taxes........................ 903,643.06
Accounts receivable ............................. 370,466.07
Real estate subject to sale...................... 1,359,500.62

 Total available assets........................ 5,408,201.23
 Net indebtedness ............................ 4,560,292.66
 In excess of debt limitation................. 14,788.46

At the trial, plaintiff contended generally that, of the items listed as available assets, the items of cash on hand, taxes assessed and not more than six years delinquent, and interest on such taxes, were the only items that should be considered as cash assets, while defendant county contended they were all proper items to be offset. Warrants issued by the defendant county pursuant to some ninety-three emergency resolutions

were involved, and of these, plaintiff contended the greater part were wrongfully issued, for reasons which we shall hereinafter give, while defendant county contended they were properly issued, and that the county had the right to issue bonds to fund such warrants.

After all the evidence had been submitted to the trial court, it decided that a considerable portion of the warrants were valid and could be funded, and disallowed the others, also deciding that, at all times herein mentioned, King county was indebted in excess of the statutory limitation. Defendants have appealed from that part of the judgment adverse to them, and plaintiff has cross-appealed from that part of the judgment holding that certain of the warrants were valid for bond funding purposes. Plaintiff, L. G. Raynor, will hereinafter be referred to as respondent, and defendants as appellants.

Appellants made twenty-four assignments of error, based upon that part of the judgment hereinbefore referred to, and respondent forty-two assignments of error.

In order that there may be no misunderstanding, may we say now that, since the holders of the warrants involved herein are not before this court, we desire it to be understood that we are not ruling on the rights of the warrant holders as such, but that we are only determining the authority of appellant King county to fund the various warrants herein.

It is admitted that, if the warrants were valid when issued, the fact that King county may have since exceeded its debt limit, or that it is now so indebted, would not prohibit such warrants being funded. It is also admitted that the bonded and warrant indebtedness making up the gross indebtedness for the years 1936, 1937, 1938, and 1939, was not authorized by a vote

of the people, and that the warrants involved in this action were not authorized by the electorate.

We desire to first consider and discuss the items which appellants contend are proper offsets against the county's gross indebtedness, in determining its net indebtedness.

■ Inasmuch as this entire case deals with the powers and duties of the county commissioners of King county, it might be well to consider generally the powers of county commissioners.

"A board of county commissioners is a tribunal of special and limited jurisdiction. Its powers are wholly statutory. It must act, if it acts legally and within its authority, in substantial accord with the statute granting its powers." *Flint v. Horsley,* 25 Wash. 648, 66 Pac. 59.

See, also, *Spokane, P. & S. R. Co. v. Franklin County,* 106 Wash. 21, 179 Pac. 113; *State v. Vantage Bridge Co.,* 134 Wash. 568, 236 Pac. 280; *Carpenter v. Okanogan County,* 163 Wash. 18, 299 Pac. 400.

■■ Section 6, Art. VIII, of the state constitution, provides in part that no county, city, town, school district, or other municipal corporation shall, for any purpose, become indebted in any manner to an amount exceeding one and one-half per centum of its taxable property, without the assent of three-fifths of the voters therein.

Rem. Rev. Stat., § 5605 [P. C. § 5400], provides in part:

"No taxing district shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the last assessed valuation of the taxable property in such taxing district . . ."

While neither the constitutional nor statutory provision expressly refers to any offsets, we have recognized that certain cash assets may be offset against the

gross indebtedness in determining the one and one-half per cent debt limit.

As indicating the policy of this court in construing constitutional and statutory restraints on the power of county commissioners, we call attention to the following statement in the early case of *State ex rel. Potter v. King County*, 45 Wash. 519, 88 Pac. 935:

"Constitutional and statutory restraints on the power of counties and other municipal corporations to incur indebtedness and issue bonds are intended for the protection of minorities, for the protection of posterity, and to protect majorities against their own improvidence, and it is the duty of the courts to enforce them."

Since the decision in the case of *State ex rel. Barton v. Hopkins*, 14 Wash. 59, 44 Pac. 134, 550, we have held that certain cash assets may be deducted from the outstanding indebtedness for the purpose of determining whether or not a county or city has exceeded its one and one-half per cent debt limit. In the case last above cited, and in the following cases: *Seymour v. Ellensburg*, 81 Wash. 365, 142 Pac. 875; *Tabb v. Funk*, 170 Wash. 545, 17 P. (2d) 18; and *Dearling v. Funk*, 177 Wash. 349, 32 P. (2d) 548, we not only limited the offset to cash assets, but limited the cash assets to cash on hand, marketable securities, taxes levied and uncollected, and interest on such taxes. In other words, the asset, to be used as an offset, must be cash or its equivalent.

▆ Appellants claimed as an asset the sum of $582,-738.23, as "estimated revenue" to be collected. This item is not listed on the statements showing the financial condition of appellant, but is shown on exhibit No. 4, admitted herein. The trial court did not pass upon this, because of the fact that the court had decided that the county could not offset real estate subject to sale, taxes assessed and uncollected, and inter-

est thereon, more than six years delinquent; that, not being able to make these deductions, the county had exceeded its debt limit, and it was therefore not necessary to pass upon the other items claimed as offsets.

It was shown by the testimony of Mr. Schunke, public accountant, and other witnesses, that this amount of $582,738.23 of estimated revenue to be collected consists of various items, such as income from fee offices, income from the sale of property, and interest on delinquent taxes. It is contended that these revenues should be included as an asset.

Are these items of such a character that they may be considered as cash assets for the purpose of determining the debt limit? We think not. It does not appear that we have ever held such items to be cash assets, nor has any authority been called to our attention which so holds. While much might be said about the certainty of collection of some of these items, they do not, in fact, consist of anything the county now has, but are based upon what it probably will have or receive. We do not conceive that such items can or should be considered as cash assets for the purpose of determining the debt limit.

We think an item, to be considered as a cash asset for this purpose, should be something which has a definite and certain present value, equivalent to cash. The only items we have heretofore allowed as cash assets, other than cash or marketable securities, are taxes assessed and uncollected, and interest thereon, and these last items were allowed on the theory that the county, having a lien on the property assessed, is assured of their collection.

Appellants cite the case of *Seymour v. Ellensburg*, 81 Wash. 365, 142 Pac. 875, to sustain their contention. We quote from the first paragraph of the cited case:

"The plaintiff claims that the city had exceeded this debt limit on August 10, 1912, October 7, 1912, and July 15, 1913. Whether, on any of these dates, the debt limit had been exceeded depends first, upon what assets of the city were *equivalent to cash* and, therefore, subject to be offset against the total indebtedness." (Italics ours.)

In the cited case, advancements had been made by the city from the current expense fund to certain local improvement district funds, and to the water works fund. The question was whether or not these temporary loans could be considered as a cash asset. We held that they could, because temporary loans from the general fund to other funds under the control of the city, where the other funds have an assured and certain source of income, do not impair the general fund, and the certainty that the temporary loans will be paid makes them the equivalent of cash. We do not think the cited case lends support to appellants' contention.

The next item claimed as an offset is "taxes receivable." Under this heading, appellants contend they should be allowed to offset all taxes assessed and uncollected, and interest thereon, while respondent contends that only taxes assessed and uncollected and not more than six years delinquent, and interest thereon, should be allowed as an offset. The trial court held in accordance with respondent's contention, and we are in accord with this ruling.

Without giving the actual figures, it is apparent from the exhibits and from the oral testimony that there were taxes more than six years delinquent in the item of "taxes receivable," claimed in the 1936, 1937, and 1939 statements. It is admitted that in the 1939 statement there were taxes in the amount of $142,639.87, which were more than six years delinquent. In support of their contention that all taxes assessed and not

collected, whether delinquent or not, and regardless of how long delinquent, should be considered as a cash asset, appellants cite *State ex rel. Barton v. Hopkins, supra; Seymour v. Ellensburg, supra; Tabb v. Funk, supra;* and *Dearling v. Funk, supra.* While all of the cited cases hold that delinquent taxes may be considered as a cash asset, in our opinion none of them, except the case of *Seymour v. Ellensburg,* expressly passes upon the question of how long taxes may be delinquent before they cease to be such an asset. In the *Seymour* case, we stated:

"In determining whether the indebtedness exceeds the limit fixed by the constitution, this court has held that, not only current taxes, but also delinquent taxes, and the interest thereon, may be treated as cash assets. . . . *State ex rel. Barton v. Hopkins,* 14 Wash. 59, 44 Pac. 134, 550 . . . The reason given for this rule is that, in legal contemplation, the collection of the taxes and interest is certain and, therefore, they are the equivalent of cash.

"In *Graves v. Stone,* 76 Wash. 88, 135 Pac. 810, it was held that, after personal property taxes had been delinquent for a period of six years, there arose a presumption of payment, this presumption being one of fact and not of law. In this respect, there can be no distinction between delinquent real and personal property taxes. If the lapse of time in one case creates a presumption of payment, it must likewise do so in the other. It would seem that delinquent taxes and interest against which there is a presumption of payment could not reasonably be considered as equivalent to cash when determining whether the constitutional debt limit of a city has been exceeded."

We do not think there is anything in the cited cases which conflicts with the rule in the *Seymour* case, but if it can be said that such is the case, we now announce the rule to be that only taxes assessed and uncollected and not more than six years delinquent, and interest thereon, may be considered as a cash asset in de-

termining whether or not a county has exceeded its debt limit of one and one-half per cent. This general rule is, of course, subject to the limitation as to taxes levied for the current year and cash on hand, as provided in Rem. Rev. Stat., § 5605. See *Tabb v. Funk, supra; Dearling v. Funk, supra.*

 It is next contended by respondent that an item of $35,763.41, principal, and $76,705.81, interest, was improperly included within the item of "taxes receivable," for the reason that the United States district court for eastern Washington had entered a decree in the case of Northern Pacific Railway Co. v. Adams County *et al.,* enjoining the collection of that amount of taxes levied by King county against the railroad. It is contended by appellants that there is an appeal pending from this decree, and that therefore this tax and interest was properly included, and should be considered as an asset. With this contention of appellants, we cannot agree. We think the presumption that taxes will be paid is certainly overcome by the entry of a decree by a court of competent jurisdiction enjoining the collection of such taxes. We can agree with the rule announced in *Spokane & I. E. R. Co. v. Spokane County,* 75 Wash. 72, 134 Pac. 688, but we are of the opinion there is nothing in the cited case inconsistent with our holding herein.

It is next contended by appellants that interest due on general and special taxes is a deductible asset. Appellants refer to Rem. Rev. Stat., § 11244 [P. C. § 6882-83], in this connection. This section says nothing more than that interest on delinquent taxes shall be credited to the current expense fund.

 We have heretofore announced the rule that only interest on taxes assessed and uncollected and not more than six years delinquent can be considered as a cash asset. It is apparent from the exhibits and the

testimony that a. very considerable amount of the item of $903,643.06, shown as accrued interest in the 1939 statement, the item of $1,189,760, shown as accrued interest in the 1937 statement, and the item of $1,-462,656, shown as accrued interest in the 1936 statement, includes interest on taxes more than six years delinquent.

In exhibit No. 26, which shows the various items which enter into the figure of $903,643.06, shown as accrued interest on taxes, in the statement of June 30, 1939, there appears an item of $157,738.78. If this latter item is interest due on special taxes to be collected by appellants, but belonging to some other taxing district, such as the state, port district, etc., and therefore not usable by the county in paying its obligations, in our opinion it could not be considered as an asset of the county.

■ Appellants also contend they are entitled to an offset of $370,466.07, listed as "accounts receivable." The trial court did not pass on this question. This item, when broken down, as shown by exhibits Nos. 3 and 4 and the testimony of Mr. Schunke, public accountant, includes an item of $142,275.14, of which $62,594.77 is listed as current expense and represents advancements made to the various departments, and might be classed as temporary loans and election expense billed out to various taxing districts. We think, under the authority of the *Seymour* case, *supra,* this item of $62,-594.77 may be considered as a cash asset. The other item of $79,680.37, going to make up the $142,275.14, is listed as social security, and is made up roughly of $34,000 due from patient accounts from Harborview hospital; $33,000 set up as a revolving fund for use in the operation of surplus commodities stamp plan, and approximately $10,000 due from state health department state aid. From the testimony, it appears that

the collection of this $34,000 from patients of Harborview hospital is so uncertain that, in our opinion, it cannot be considered as a cash asset. While it is difficult to understand, from the record, just how this surplus commodities stamp plan works, we are of the opinion that it is of such a character that it should not be considered as a cash asset. We are of the opinion the item of $10,000 due from the state health department state aid should be considered as a cash asset.

The next item listed under "accounts receivable" is one for $224,463.46. This sum represents an amount which it is estimated the county will receive from the sale of real estate sold on contract. We quote Mr. Schunke in regard to this item: "I presume it might be the history of those sales that many of them are never completed." We think it apparent from the nature of this claimed asset, and from the testimony, that the amount the county will receive from these sales is too uncertain to be classed as a cash asset.

There is also included in "accounts receivable" an item designated "rentals receivable." The original figure set up as rentals to be received is $6,500, and of this amount it is admitted that $5,000 will be lost. In other words, $5,000 of this amount is listed as bad debts, leaving a balance of $1,500, claimed as an offset. We think the above figures demonstrate that no part of the $6,500 can be classed as a cash asset.

We now come to one of the major items listed by appellants as a cash asset, namely, "real estate subject to sale." This item is listed in the 1939 statement at $1,359,500.62; in the 1937 statement at $1,958,000; and in the 1936 statement at $1,558,000. The figure $1,359,500.62 is apparently based upon the aggregate amount of taxes levied against the tax title property, and interest thereon, now held by the county. The trial court held this item could not be considered as a cash

asset, and with this ruling we agree. Appellants, in their brief, frankly admit that they have been unable to find any authority on this proposition. Certainly this court has never decided that such property may be considered as a cash asset. The first difficulty which confronts us is: At what figure are we to consider this property, or on what basis can a value be fixed, which we can consider in determining this a cash asset?

Appellants first contend that we should use as a basis the amount of all taxes and interest due on such property at time of sale, arguing that, if delinquent taxes are a cash asset, then, under the decision of *Sasse v. King County*, 196 Wash. 242, 82 P. (2d) 536, the tax title property itself should be considered merely as a substitute for the lien of the taxes which were assessed before the foreclosure. Appellants further contend that, if we do not wish to take the aforementioned basis, we should at least accept as a basis eighty per cent of the amount of such taxes, that being the amount it is claimed the county will receive on a sale of such property.

In order to fix some value on this property, appellants introduced three witnesses, namely, Mr. Young, Mr. Lynch, and Mr. Christy. Mr. Young is apparently a man of much experience in appraising property in King county; Mr. Lynch is an employee in the office of the county property agent; and Mr. Christy is chief clerk in the treasurer's office, and has had charge of delinquent tax sales. It is admitted that King county holds title to about fifty thousand pieces of real property, both within and without the limits of the city of Seattle. Much of this property is in districts where there has been but little or no movement in real estate, and some, of course, is in sections where there is a demand for property. Some of the property lies within the Duwamish waterway district, where any collec-

tions made must be divided with that district. A considerable part of the property within the city has local improvement district assessments against it. Some of this property has been held by the county for a number of years.

The three men hereinbefore referred to, as a general basis for fixing a value on this property, selected at random one hundred pieces from the fifty thousand pieces held by the county, and using the one hundred pieces as a basis, Mr. Young was of the opinion the county would receive ninety-eight per cent of its taxes, when such property was sold pursuant to the statutory method. It is apparent, however, from the testimony of Mr. Young that he seriously doubted that a proper or fair value could be placed on fifty thousand pieces of real estate from the examination of one hundred pieces. The estimates of the other two men were lower than that of Mr. Young; Mr. Christy finally stating that at least eighty per cent of the amount of the taxes would be collected when such property was sold. It was admitted that the county would not receive the full amount of its taxes and interest, and the three men could not agree on a value.

These are a few of the difficulties which present themselves, in considering this property as a cash asset, and there are other factors, as shown by the testimony, which would enter into a determination of the probable amount the county will receive from a sale of this property.

We think that to consider this property as a cash asset for the purpose of determining the debt limit, would be extending the rule beyond the point where any court has gone; and that, by so doing, we would, in effect, open the door for a county to exceed its debt limit almost at will, by offsetting against its indebted-

ness, items, such as real estate subject to sale, which have no fixed, definite cash value.

Again we say that the framers of the constitution and the legislature undoubtedly had a definite purpose in mind in limiting the amount of indebtedness which could legally be incurred by a county or other municipality. And we feel bound, therefore, not to allow as cash assets those items which depend upon some contingency, or which deal in speculations or probabilities, to establish a value.

From the conclusions we have reached as to cash assets, it is apparent that appellant King county was indebted beyond its limit at all times herein referred to.

We now come to a consideration of the expenditures made pursuant to certain emergency resolutions of the board of county commissioners. Appellants contend the trial court had no authority to inquire into the facts surrounding the emergency appropriations and determine whether or not there was an emergency. We are satisfied that the inquiry of the trial court was not directed to the question of whether or not there was in fact an emergency, as provided for in the budget law (Rem. Rev. Stat., §§ 3997-1 to 3997-10 [P. C. §§ 1652-1 to 1652-10], inclusive), but was directed to the question of whether or not such expenditures could be considered either mandatory or necessary for the continued existence of the county, it appearing that, at the time such expenditures were made, the county had exceeded its debt limit of one and one-half per cent. It is our opinion the court had a right to so inquire.

We have carefully examined Rem. Rev. Stat., §§ 3997-1 to 3997-10, inclusive, and the cases cited by appellants, including the case of *State ex rel. Porter v. Superior Court*, 145 Wash. 551, 261 Pac. 90, and we are convinced that a board of county commissioners, in

passing upon an emergency appropriation under the budget law, in no way passes upon or determines whether or not the county, 'at the time of declaring such emergency and making the appropriation, was indebted in excess of its one and one-half per cent limit, or whether, the county being in excess of such limit, the expenditure was either mandatory or necessary to corporate existence; neither do we think the court, in the summary proceeding provided in case of an appeal from the order of the board, passes upon such debt limit, or whether the expenditure was mandatory or necessary; but that all the board determines is whether or not an emergency exists, as provided in the budget law, and whether or not the expenditure to be made is excessive, and the court on appeal determines the same facts. This being true, neither the action of the board, even though no appeal has been taken therefrom, nor the order of the court, would be final and conclusive, so as to prohibit the questions being raised in a proper action as to whether or not, at the time such appropriation was made, the county was indebted in excess of its one and one-half per cent limit; and if it was, whether such expenditure was either mandatory or necessary.

We now come to the emergency appropriation made herein, pursuant to which the warrants in question were issued.

With a few exceptions, to which reference will be made, the appropriations were made by resolution signed by all members of the board of county commissioners, and proper notice was given, as required by statute. However, regardless of the fact that the budget law may have been complied with, in so far as the board found an emergency to exist, the county being, at the time such appropriations were made, in excess of its debt limit, we are confronted with the

question of whether or not such expenditures were mandatory or necessary. The latest expression of this court on this subject is *Goff v. Seattle,* 197 Wash. 665, 86 P. (2d) 222, wherein we find the following statement:

"The rule fairly to be deduced from the best considered of the decisions is that, to authorize the incurring of municipal obligations in excess of the debt limit, it is not enough that they be incurred for municipal purposes, convenient and useful, or broadly intended to promote the public good; the purposes must be such as are strictly essential to the continued existence of the municipality. It is within the power of a municipality to supply to the public a wide range of services and conveniences not essential to its corporate existence, but the cost of supplying them must be borne by resources available without the incurring of debt beyond the limit fixed by the constitution."

Considering the rule as announced in the *Goff* case, *supra,* and in the case of *Patterson v. Edmonds,* 72 Wash. 88, 129 Pac. 895, to which the *Goff* case particularly refers, we think it has been established in this state that, where a municipality has exceeded its debt limit, it may legally incur indebtedness only for those purposes made mandatory by the constitution and laws of the state, and for such as are necessary to maintain its corporate existence.

With this rule in mind, we shall examine the expenditures made, some of which the trial court determined come within the rule last above announced, and some it held did not.

The trial court allowed expenditures made pursuant to some sixty-seven emergency appropriations, which included those conceded to be proper on the theory that the expenditures were either mandatory or necessary for corporate existence. We have examined the resolutions and the exhibits and testimony relative

thereto, and we are in accord with the rulings of the trial court, except as hereinafter noted. The following are the expenditures allowed by the trial court, and which it held could be funded.

It is conceded that the expenditures made pursuant to the following resolutions were proper, and may be funded: No. 6181, passed June 8, 1936, for prosecuting attorney's office, $1,470; No. 6194, for blind pensions, passed June 9, 1936, $800; No. 6249, passed August 3, 1936, for publishing delinquent tax list, $11,500; No. 6307, passed October 19, 1936, for justice of the peace, Charles W. Claypool, $300; No. 6308, passed October 19, 1936, for constables, $1,000; No. 6309, passed October 19, 1936, for fire patrol, $422.82; No. 6329, passed November 16, 1936, for juvenile detention home, $1,-175; No. 6331, passed November 16, 1936, for juvenile court, $1,500; No. 6338, passed November 23, 1936, for treasurer's office, $11,652; No. 6344, passed December 3, 1936, for county auditor, $6,000; No. 6362, passed December 22, 1936, for court house, $2,200; No. 6365, passed December 26, 1936, for juvenile court, $3,885, and for juvenile detention home, $150; No. 6629, passed September 20, 1937, for forest fire patrol, $735; No. 6696, passed November 29, 1937, for county auditor, $2,500; No. 6713-6717, passed December 20, 1937, for public welfare (food and lodging of indigent patients at King county hospital), $16,150.20; No. 6714, passed December 13, 1937, for juvenile court, $3,135, and for juvenile detention home, $550; No. 6515, passed June 14, 1937, for King county purchasing and property agent, $2,500; No. 7074, passed September 6, 1938, for purchasing and property department, $960; No. 7160, passed December 8, 1938, for county treasurer, $2,500; No. 7176, passed December 21, 1938, for court house, $5,000; No. 7177, passed December 27, 1938, for prosecuting attorney, $1,534.55; No. 7260, passed February

27, 1939, for sheriff's office, $2,000; No. 7313, passed April 18, 1939, for fire patrol, $10,000.

All of the expenditures hereinafter referred to, and which were allowed by the trial court, were objected to by respondent, and his assignments of error are predicated thereon.

The next group of resolutions are those authorizing expenditures by the public welfare department, for direct relief: No. 6168, passed May 25, 1936, $40,000; No. 6245, passed July 27, 1936, $200,000; No. 6360, passed December 14, 1936, for $100,000; No. 6380, passed January 27, 1937, $100,000; No. 6419, passed March 15, 1937, $100,000; No. 6461, passed May 10, 1937, $71,000.

As to these expenditures made by the welfare department for direct relief, it is the contention of respondent that, by the passage of chapter 118, Laws of 1935, p. 330 (Rem. Rev. Stat. (Sup.) § 9992-41 [P. C. § 4418-81] *et seq.*), the state legislature took the problem of relief entirely from the counties, and that King county was without authority to make these relief appropriations after April, 1935.

Appellants contended, and the trial court held, that the act of 1935 did not relieve the county of the duty of providing relief for persons other than employable unemployed, and we are in accord with the court's ruling. There was testimony to the effect that these expenditures were made for the relief of unemployables, such as the sick, etc., and that none of this money was expended in rendering relief to employable unemployed. An examination of chapter 118, *supra*, convinces us that that act was passed to render assistance to employable unemployed, and that the county was not thereby relieved of the duty of rendering assistance to those not classed as employable unemployed. This act is entitled: "An Act providing for emergency un-

employment relief . . . " Section 1, p. 330, provides in part:

"Economic conditions which led to the enactment of chapters 8 and 65, Laws of 1933, have not improved to such an extent as to warrant abandonment of emergency unemployment relief. . . ." Rem. Rev. Stat. (Sup.), § 9992-41 [P. C. § 4418-81].

Section 2, p. 331, provides in part: "It shall be the duty of the state to provide for the relief of the unemployed. . . ." Rem. Rev. Stat. (Sup.), § 9992-42 [P. C. § 4418-82].

The following resolutions authorized expenditures to pay judgments and claims: No. 6269, passed September 10, 1936, $5,000; No. 6311, passed October 19, 1936, $30,000; No. 6126, passed in March, 1936, $3,000; No. 6376, passed January 18, 1937, $12,000; No. 6437, passed April 12, 1937, $10,000; No. 6708, passed December 6, 1937, $13,424.12; No. 6844, passed March 28, 1938, $5,000; No. 6891, passed May 2, 1938, $15,000; No. 7187, passed December 28, 1938, $4,500.

In none of the resolutions making appropriations to pay judgments and claims does it appear whether the suit was one for personal injuries, for damage to property, or on contract. However, it appears from the testimony, and seems to be conceded, that all of the appropriations, except the sum of $28,389.52, were made to pay judgments for personal injuries or for property damages. As near as we can determine, the $28,389.52 item was to pay judgments rendered for services performed by employees in the clerk's and assessor's offices, the judgment in the Association Collector's case, and a claim of $271 of some hospital employees.

We are of the opinion that only the expenditures made to pay judgments for personal injuries and property damages may be funded, and that the trial court

was in error in allowing the expenditure for the $28,-389.52. See *Lorence v. Bean,* 18 Wash. 36, 50 Pac. 582. McQuillin on Municipal Corporations (2d ed.), Rev. Vol. 6, 34, § 2376, states:

"Provisions as to debt limits, apply only to indebtedness which arises ex contractu and do not apply to involuntary liability arising ex delicto."

See, also, 44 C. J. 1136, § 4073; Gray, Limitations of Taxing Power and Public Indebtedness, 1072, § 2089 (1906); *Long Beach v. Lisenby,* 180 Cal. 52, 179 Pac. 198.

No. 6170, passed May 25, 1936, for $1,000, was for the coroner's office, for preparing necessary transcripts of testimony taken at inquests. We think this expense was incurred in performing a mandatory duty, under Rem. Rev. Stat., § 4188 [P. C. § 1744], and was properly allowed.

No. 6259, passed August 22, 1936. There were various items included in this appropriation, but the trial court allowed only $1,690, for sheriff's office, and $8,136.90, for the jail.

No. 6288, passed September 28, 1936, included $3,250, for coroner's office, and $1,000, for morgue; No. 6332, passed November 16, 1936, for crematory, $475; No. 6333, passed November 16, 1936, for county home, $6,000; No. 6337, passed November 23, 1936, for salaries and wages of sheriff's office for harbor patrol, $8,085.89; No. 6366, passed December 26, 1936, for prosecuting attorney, $1,200 (this expenditure made necessary by the calling of a grand jury); No. 6412-6418, passed March 15, 1937, for witness fees, mileage and jury fees, in criminal cases in the justice courts, $3,600.

No. 6491-6521, passed June 22, 1937, for sponsor's share of W. P. A. project, $61,000; No. 7006, passed July 5, 1938, $119,850, and No. 7113, passed October 3, 1938, $120,000, for sponsor's share in W. P. A. road

projects; No. 7075, passed September 6, 1938, for W. P. A. housekeeping project, $1,000, of which only $190.15 was actually expended; No. 7148, passed November 28, 1938, for sponsor's share of W. P. A. parks project, $10,000.

The trial court allowed these last five items where relief was furnished through W. P. A. projects, upon the theory that, after the passage of chapter 180, Laws of 1937, p. 697, which became effective April 1, 1937, there was a mandatory duty placed upon the county, as well as the state, to render assistance to the unemployed, and that it was proper to render this public assistance through the medium of the W. P. A. While this may be termed indirect relief, we are inclined to agree with the trial court that the items can be justified as mandatory relief expenditures, and that chapter 180, *supra,* contemplates that such relief may be furnished through such Federal agencies as the W. P. A. While chapter 180, Laws of 1937, provides only for a levy of a three mills tax by the county commissioners for such public assistance, it also provides that nothing in the act shall limit the board of county commissioners from declaring an emergency, and providing revenue necessary thereto.

No. 6520, passed June 22, 1937, for general outlay, $10,000. After the passage of chapter 180, Laws of 1937, it became necessary to furnish quarters for the welfare department. This expenditure was made for that purpose, and was necessary, as shown by the testimony.

No. 6639, passed September 30, 1937, for $5,500, for prosecuting attorney. Of this amount, $5,000 was for special services, and $500 for transportation. It was practically conceded by appellants that the $5,000 item was not a proper expenditure to be funded. The trial court allowed the item of $500, and disallowed the

$5,000 item. We are in accord with the trial court's ruling.

No. 6672-6686, passed November 15, 1937, for county morgue, $2,500; No. 6691-6707, passed December 6, 1937, for court house, $16,392.90. This last item included salaries and wages for janitors, $1,200, and an item of $5,059.25 for repairing balcony on ninth floor. The respondent practically conceded the last two items mentioned were properly allowed. The trial court allowed the last two items, and disallowed the balance of the expenditures made pursuant to this resolution, and we are in accord with this ruling.

No. 6709-6716, passed December 20, 1937, for court house, $9,000. This was for light and power for County-City building, and we think was a necessary expenditure.

No. 6723, passed December 27, 1937, for prosecuting attorney, $1,000. We are satisfied, from an examination of the record, that this was a necessary expense.

No. 7009, passed July 5, 1938, for airport, $6,500, and No. 7007, passed July 5, 1938, for Kirkland Process Plant, $10,462. We are of the opinion that neither of the last two items can be justified as mandatory relief, under chapter 180, Laws of 1937, and that is the only theory on which it is claimed they could be allowed. While we appreciate the broad scope of authority granted by chapter 180, *supra*, in furnishing relief to the unemployed, still we do not believe that it was contemplated that expenditures would or could be made in furthering projects such as last mentioned, commendable as they may be, if the county were in excess of its debt limit.

No. 7153, passed December 5, 1938, for commissioners, $5,500. This item was for publishing notice of delinquent tax sale.

No. 7161, passed December 8, 1938, for county assessor, $21,898.52. This was a part of the assessor's revaluation project. The sum of $21,898.52 is made up of various items, among them being an item of $2,569.66 for aerial survey crews, $1,870, aerial survey, and $3,984 for field photography. We do not think, from the testimony, these last three items can be justified as mandatory relief, and certainly they were not necessary, conceding that the assessor was authorized to make a reasonable expenditure for revaluing the county property. The items last mentioned will not be allowed; the other items included in the appropriation may be funded.

No. 7195, passed January 9, 1939, for airport, $2,-805.87. While the trial court allowed this expenditure, we are unable to agree that it was a proper fundable item, and it will be disallowed, for the same reason assigned in not allowing No. 7009.

No. 7196, passed January 9, 1939, for airport, $18,-049.05. This item was properly allowed, as it is merely a transfer of funds. It was simply paying out money paid in by the Federal government.

Respondent's assignments of error Nos. 41 and 42 are based upon the allowance by the court of an appropriation of $113,232.75, as of December 31, 1936, and an appropriation for January, February, and March, 1937, in the sum of $30,025, for mothers' pensions. Orders allowing the pensions referred to, and directing their payment, were made after hearings in accordance with Rem. Rev. Stat., § 9993 [P. C. § 4419] et seq. If the court found the mother entitled to a pension, it made an order to that effect, and a certified copy of such order was filed with the county auditor, and thereupon and thereafter and as long as such order remains in force, it is the duty of the county auditor to draw his warrant on the current expense fund, in

favor of the mother, for the amount specified in the order. We think, such being the law, these expenditures came within the exception in § 3997-5 [P. C. § 1652-5], which provides: "Except upon an order of a court of competent jurisdiction," and within the rule announced in *State ex rel. Richardson v. Clark County*, 186 Wash. 79, 56 P. (2d) 1023, and required no emergency resolution of the board to authorize the payment, and that such expenditures are valid obligations of the county, and may be funded.

The trial court held the expenditures made pursuant to the emergency resolutions hereinafter set out were not of such a nature that they could be funded by a bond issue. Appellants' assignments of error are based upon the court's refusal to allow such expenditures.

Much that we have heretofore said relative to the expenditures allowed by the court will be applicable to the expenditures not allowed, and where possible, reference will simply be made to our previous rulings herein.

Resolution No. 6156, passed May 11, 1936, $600, and No. 6330, passed November 16, 1936, $350, were for superintendent of schools. These two items were for additional help because of additional work in the office. Mrs. Buchanan testified she could not have conducted her office for the balance of the year without this stenographic help. We are unable to agree with the trial court on these items, and believe they should be allowed.

No. 6180, passed June 8, 1936, $98,500; No. 6091, passed February 11, 1936, $160,000; No. 6343, passed December 3, 1936, $18,376.33; No. 6417, passed March 8, 1937, $15,421.39; and No. 6794, passed February 21, 1938, $4,687.47. These emergency appropriations were passed to assist in paying sponsor's share of W. P. A. revaluation project. We have already held there was

no authority given in the statute, nor duty upon the county, prior to April 1, 1937, and subsequent to passage of chapter 118, Laws of 1935, to furnish relief to employable unemployed, either directly or through any governmental agency. If these items are to be allowed, it must be upon the theory of mandatory relief furnished indirectly through a W. P. A. project. We find no such authority in the statute. Neither do we think these items can be allowed as necessary expense. Nos. 6794 and 6417 are entirely for aerial surveys, which certainly, under no stretch of the imagination, could be classed as necessary for the existence of government. The expenditures in Nos. 6180 and 6343 are so intermingled with the aerial survey that we are unable to segregate them. Had the budget law been complied with by the assessor in the matter of original expenditures to revalue the county property, and had emergency appropriations been made under the budget law for proper expenditures for this purpose, a different question would be before us, but apparently no attempt was made by the assessor to provide in his budget for any part of the cost of this revaluation project, which he claims was a mandatory duty. We agree with the trial court that these expenditures may not be funded. We do not think the decree in the case of Dibble v. Stevenson *et al.*, No. 28766 of the superior court for King county (not appealed), tried by Judge Kinne, is conclusive as to the $160,000 appropriation, in so far as the debt limit is concerned, as we have heretofore stated in this opinion.

No. 6182, passed June 8, 1936, for $1,500, was for the purpose of building a dock at Manzanita beach. This was clearly not a proper expenditure, under the *Goff* case, and was correctly disallowed.

No. 6259, passed August 22, 1936, authorized expenditure for sheriff's office and jail, in the sum of $11,-

956.92. The trial court allowed the sum of $1,690 for sheriff's office, and $8,136.90 for jail. We approved such allowances. The trial court disallowed the other items included in No. 6259, and we are also in accord with this ruling.

No. 6257, passed August 22, 1936, for airport, $10,000. While, as we have hereinbefore stated, there is no mandatory duty on the county to carry on an airport, here the original work on this airport had been authorized by a vote of the people, and it does not appear that the airport could be closed. It does appear from the testimony that the surface, or we might term it the landing field, was in a dangerous condition, making it dangerous for planes using this field to land, and that this appropriation was made for the purpose of making the airport safe. We are inclined to agree with appellants that an emergency existed, whereby it became necessary for the county to do this work, to avoid the possibility of suits for damages, regardless of the fact that the county had exceeded its debt limit. This item will be allowed.

No. 6290, passed September 28, 1936, for engineer's office, $10,000. This appropriation was made to enable the engineer to carry on work in connection with W. P. A. work. This was for indirect relief outside of the regular and normal operations of his office, and in our opinion cannot be funded.

No. 6291, passed September 28, 1936, for county wharves, $10,000. We believe there is a condition shown in connection with the necessity for this expenditure which differentiates this item from those which the court held could not be funded in the *Goff* case. While it is true that the operation of ferries is not a mandatory duty of the county, we think, as a practical proposition, it is also true that the county, having these docks which are being used, must keep them in a rea-

sonably safe state of repair, the same as a highway. We do not mean that, when the county has exceeded its debt limit, it may embark on a venture which is not mandatory, like operating ferries, building wharves, etc., but, having these docks, we doubt if, as suggested by respondent, they can be fenced off and not used, and, being in a dangerous condition, we think there is a mandatory duty on the county to put them in a reasonably safe condition. We are of the opinion that this expenditure may be funded.

No. 6337, passed November 23, 1936, for harbor patrol. This appropriation included two items—one for $24.06, and another for $8,085.89. The court allowed the item of $8,085.89, and we agreed with this ruling. The item of $24.06 was not allowed, and we agree this is not a proper item to be funded.

No. 6354, passed December 14, 1936, for jail, $8,000, was for the care and feeding of Federal and city prisoners during the year 1936. The trial court held this item could not be funded, as there was no mandatory duty on the sheriff to receive and care for such prisoners. We think the trial court was in error, in so far as Federal prisoners are concerned. We are of the opinion that, under Rem. Rev. Stat., § 10209 [P. C. § 3425], there is a mandatory duty on the sheriff to receive and care for Federal prisoners. See *King County v. Stringer,* 130 Wash. 287, 227 Pac. 17. We think this item may be funded as to that portion which was for the care and feeding of Federal prisoners, and that the portion relative to city prisoners may not be funded, there being no duty cast upon the sheriff to receive city prisoners.

No. 6436-6460, passed May 10, 1937, for commissioners, $1,600. This appropriation was made for the purpose of hiring counsel to defend certain county commissioners, who had been sued in their individual ca-

pacity, in a suit against Sheriff Bannick. While the superior court judges approved this item, we are of the opinion this did not authorize the expenditure, as the county was then in excess of its debt limit. Such an *ex parte* court order has nothing to do with the debt limit, nor does it foreclose the raising of that question. This item may not be funded. See *State ex rel. Richardson v. Clark County*, 186 Wash. 79, 56 P. (2d) 1023.

No. 6512-6522, passed June 22, 1937, $10,000, was made for the purpose of operating the ferry Washington, at a time there was a strike. Desirable as it may have been to operate this ferry, we are of the opinion it was neither a mandatory nor necessary expense, and cannot be funded.

No. 6639, passed September 30, 1937, for prosecuting attorney, $5,500. This item is made up of $500 for transportation, and $5,000 for special service of investigators. The court allowed the $500 item, and we agreed with that ruling. The court refused to allow the $5,000 item, and we are in accord with such ruling.

No. 6668, passed October 18, 1937, for care and feeding of Federal and city prisoners, $10,000. The same ruling will apply to this item as to resolution No. 6354, for the reasons therein stated.

No. 6669-6673, passed November 1, 1937, $10,000, was for gas, oil, and automobile expense for the sheriff's office. This item had accumulated over a period of two years, due to a misunderstanding in the sheriff's office, that the items had been budgeted in another department. While it is true it might be said that this item was not a necessary expense, in view of the fact that the office had continued to operate, yet we are inclined to the view that it was necessary to the maintenance and operation of the sheriff's office that he have gas and oil for his automobiles, and that this

failure to budget was due to a misunderstanding and the manner in which the county garage handles and charges the automobile expense to the different departments. We believe this item is a proper expenditure, and may be funded.

No. 6691-6707, passed December 6, 1937, for court house, $16,392.90. This is made up of various items. The court allowed the items of $1,200 for janitors, and $5,059.29 for repairing the balcony on the ninth floor, and we have approved this expenditure. The court refused to allow the other items totaling $10,133.65, and we agree these items may not be funded.

No. 6692-6706, passed December 6, 1937, $666.85. This was an appropriation made to the sheriff's office for harbor patrol, and we think, under the evidence, was not an expenditure which can be funded.

No. 6850, passed April 4, 1938, for county auditor, $1,800. This expenditure was for an industrial insurance investigation. We agree with the trial court that this was neither a mandatory nor necessary expenditure.

No. 6942, passed May 24, 1938, $1,500. This expenditure was for office furniture and safe, for the purchasing and property department. We do not think this was a necessary expense, under the testimony, and therefore it cannot be funded.

No. 7008, passed July 5, 1938, for assessor, $9,978.69. This was the sponsor's portion of a W. P. A. project. We have heretofore sustained the court's ruling on other items appropriated for the assessor, to be used as sponsor's share on the revaluation project, to the effect that such expenditures could not be funded. Our ruling was based upon the fact that, prior to April 1, 1937, the county had no authority to furnish indirect relief of this character to employable unemployed, and the further fact that the aerial survey part of this

project could not be justified even as a relief measure. No. 7008 was made subsequent to April 1, 1937, and it does not appear that any of the expenditure was used for aerial survey, but was used for necessary supplies and traveling expense of the office. We are inclined to the view that this expenditure may be funded, on the theory either of mandatory relief or necessary expense. The trial court was seemingly in doubt about this item, and we appreciate it presented a difficult situation. We think, however, it may be distinguished from those expenditures referred to and not allowed.

No. 7015, passed July 11, 1938, $22,059.95, was for the construction of warehouse and office building at airport. This was a P. W. A. project, and the work was done under contract. No. 7154, passed December 5, 1938, $3,500, was for the traffic control tower at airport. We agree with the trial court that neither of these last two items can be funded.

No. 7159, passed December 8, 1938, for county wharves, $3,550. The testimony of Mr. King, an employee of the engineer's office, relative to this item, is illuminating. When asked what the above appropriation was for, he said:

"Well, some months previous to this an item had been transferred in the wharves budget from material and supplies to labor, and some months after that was done, in fact, about the time that we actually started to use the money made available by that transfer, *someone* in the auditor's office notified *somebody* in a roundabout way that that could not be done legally. That is, that money could not be transferred . . . The suggestion was that an appropriation of $3,550 for labor be made and that the auditor simply earmark $3,550 in the material item, which was done . . ."

While this method of operation seemed simple to the witness, we are unable to find in it anything which

corresponds to the procedure prescribed by statute. The trial court properly refused to allow this item.

No. 7179, passed December 27, 1938, for care and feeding of Federal and city prisoners, $8,500. The same ruling will apply to this item as to No. 6354, for the reasons there stated.

No. 7180, passed December 27, 1938, for the King County Adjustment Bureau, $2,453.40, was for collecting accounts receivable. We are of the opinion this cannot be funded, and it is also further evidence that accounts receivable should not be considered as a cash asset.

No. 7195, passed January 9, 1939, seems to be a reappropriation of the unexpended portion of the items heretofore passed upon in resolutions Nos. 7009, 7015 and 7154. We have heretofore expressed our opinion in regard to these items.

No. 7227, passed January 30, 1939, $2,601.30. This is apparently a reappropriation of money appropriated in 1936, for the purpose of paying the Pacific Aerial Surveys, Inc., for making the aerial survey for the assessor, and not expended. While we have been unable to check this against the particular appropriation, we have heretofore held the expenditure for aerial survey could not be funded, and we again so state.

No. 7236, passed February 6, 1939, $11,000. This was for insurance on King county ferries. We appreciate that good business judgment would dictate that the commissioners carry insurance on ferries belonging to the county, and we held in *State ex rel. King County v. Murrow*, 199 Wash. 685, 93 P. (2d) 304, that the county commissioners had implied power to insure such ferry boats, but we know of no statutory provision making such action mandatory. We agree with the trial court that this item may not be funded.

No. 7252, passed February 20, 1939, $1,209.50, was

for an automobile for prosecuting attorney. The testimony does not show this was a necessary expenditure, and it was properly disallowed.

No. 7277, passed March 20, 1939, for court house, $18,000. It was agreed this item might go out, because of lack of proof to establish it as a fundable item. We agree it cannot be funded.

The trial court refused to allow an item of $1,-136.01, for juvenile court, probation department; an item of $177,711.94, for care of insane, under date of December 31, 1936; an item of $46,521.63, for care of insane, under date of April 15, 1937; and an item of $2,346.72, for superior court, under date of January 20, 1939.

Appellants contend the above items should have been allowed, because the expenditures were made pursuant to valid court orders. No attempt was made to comply with the budget law relative to these items, either as to providing for such appropriation in the budget or in declaring an emergency. Appellants, however, concede that the item of $1,136.01, for juvenile court, is an improper item to be funded, and with this we agree. As to the items of care of insane, appellants contend that, at the time of commitment, the court makes an order of payment, and that therefore these items are based on a valid court order. We cannot agree that the court, at the time of commitment of an insane person, makes an order as to whether the county or state will pay for the care of such patient. *State ex rel. Department of Finance, Budget & Business v. Thurston County,* 199 Wash. 398, 92 P. (2d) 234. We are therefore of the opinion that, while the care of insane may be a mandatory duty, inasmuch as appellants have not complied with the budget law, and as there is no court order allowing or authorizing these expenditures, they cannot be funded.

 The item of $2,346.72, for superior court, was authorized, if at all, by an *ex parte* order, signed by all the superior court judges of King county. We do not think this was such a court order as is contemplated under Rem. Rev. Stat., § 3997-5, as construed in *State ex rel. Richardson v. Clark County, supra,* wherein we stated, referring to the above provision:

"Manifestly, this phrase refers to judgments and orders of a court made in ordinary course in some proceeding establishing the liability of the county."

For the reasons herein assigned, the judgment will be modified, with instructions to the trial court to enter judgment in accordance herewith. Neither party will recover costs on this appeal.

STEINERT, MAIN, GERAGHTY, ROBINSON, BEALS, and SIMPSON, JJ., concur.

MILLARD, J. (dissenting)—I concur in the foregoing opinion except as to two items. The trial court erred in holding that the expenditures for the care of the insane—a mandatory duty—and the expenditure pursuant to court order of January 20, 1939, in the amount of $2,346.72 for the superior court, could not be refunded through the issuance of bonds.

BLAKE, C. J., concurs with MILLARD, J.