134 Cal.Rptr.2d 768 (2003)
109 Cal.App.4th 469
Helga CARTER, Plaintiff and Respondent,
v.
DEPARTMENT OF VETERANS AFFAIRS, Defendant and Appellant.
No. E030908.
Court of Appeal, Fourth District, Division Two.
June 4, 2003.
Review Granted August 13, 2003.
Joseph Maguire, John H. McCardle and Patricia M. Keegan for Defendant and Appellant.
Terry K. Davis, Santa Ana, for Plaintiff and Respondent.

*769 OPINION
WARD, J.
Plaintiff and respondent Helga Carter worked as a nurse in a veterans' residence facility administered by defendant and appellant, the Department of Veterans Affairs (the employer). Plaintiff sued the employer, alleging it was liable for sexual harassment on a hostile environment theory. The alleged hostile environment was created, not by a coemployee, but by one of the patient residents of the facility. The trial court held that an employer may be liable under the California Fan-Employment and Housing Act (FEHA) (Gov. Code, §12900 et seq.) for the harassing conduct of clients or customers, and gave judgment for plaintiff. The employer appeals.

FACTS AND PROCEDURAL HISTORY
The employer, an agency of the State of California, owns and operates certain "Veterans' Homes," to care for "aged and disabled" veterans.[1] The Veterans' Homes provide varying levels of care, from independent living to skilled nursing care. Plaintiff, a registered nurse, was hired in 1996 and assigned to work in the ambulatory care clinic, which provides outpatient services to the veterans occupying independent living facilities.
Elbert Scott Brown, a veteran, was a tenant resident of the independent living facilities of the Veterans' Home where plaintiff worked. Brown received a penile implant in 1996. Plaintiff performed some nursing care for Brown relative to his penile implant. After receiving the implant, Brown began making suggestive remarks to plaintiff, such as, "You've got nice breasts," or "You've got a nice ass."
Quilting was one of Brown's hobbies. At a social event in approximately October of 1996, Brown offered to give quilting lessons to some of the staff members. For about two months thereafter, plaintiff made frequent visits to Brown's room, ostensibly for quilting lessons. Plaintiff testified that she would receive instruction from Brown; then, at home, she would work on the quilt on her sewing machine. The next day, she would show Brown her progress and receive instruction on the next step. It took plaintiff about two months to complete a quilt for her daughter.
After plaintiff finished her quilting project with Brown, she stopped spending so much time with him. Plaintiff started learning how to play pool with another resident, Ray Bishop. Bishop resided in the same building as Brown. Plaintiff would occasionally have coffee with Bishop.
Residents of the Veterans' Home were generally veterans over the age of 62, or otherwise suffering from some disability which prevented them from earning a living. To provide a social outlet for the residents, the Veterans' Home had an "adopt-a-resident" program at the holidays under which staff or employees might invite a resident to share Thanksgiving or Christmas dinner in the employee's home. As part of the "adopt-a-resident" program, plaintiff invited Brown to her home for Thanksgiving dinner. Brown seemed particularly lonely. Brown was alienated from his family; his family members did not visit him at the Veterans' Home. For some time, Brown had been advertising for a companion in "senior singles" magazines.
In addition, after plaintiff had completed the quilt, she on one occasion invited Brown to dinner to thank him for his help.
At first, plaintiff regarded Brown's remarks and attitude toward her as inappropriate *770 but harmless. Plaintiff hoped, for example, after Brown had visited her home, that he would realize that plaintiff had a husband and family, and that he would stop his inappropriate conduct.
Instead, sometime after the holidays, Brown's behavior became worse. According to plaintiff, Brown became "very attached" to her. Plaintiff explained that Brown told her that he was "having no luck" with his personal advertisements, but "he didn't really need to, he felt at that point because, after all, he had me." Brown told plaintiff that he wanted to sleep with her. Plaintiff tried to laugh it off; she told Brown she was happily married. Brown threatened that; if plaintiff refused, he would ruin her reputation by telling everyone that he had slept with her. Plaintiff was "shocked at his persistence"; Brown said she "might as well sleep with him either way," because he would ruin her reputation whether she did so or not. Plaintiff still refused; she told Brown to "[p]ut a sign on the freeway I don't care. It will never happen." Plaintiff later overheard Brown telling others in the clinic that plaintiff was sleeping with him.
At some point, plaintiff complained to her supervisor about Brown. Brown did not desist, however. Plaintiff testified that Brown "continued harassing me in the clinic. He was chasing me in the hall with his scooter. He was there first thing in the morning when I unlocked the clinic. He came to the clinic many times a day for no reason. He was everywhere." Plaintiff testified that Brown several times tried to ram her with his scooter. He would call and leave derogatory and sexually explicit messages on her home telephone recorder.
After plaintiff complained, the employer undertook to counsel Brown to leave plaintiff alone. Plaintiff was issued a walkie-talkie she could use to call security if Brown caused problems at the clinic. Plaintiff testified, however, that Brown's conduct did not change.
Plaintiff twice went on stress leave. After the expiration of her second leave, plaintiff did not return to work. Brown was still residing in the Veterans' Home, and, according to plaintiff, "nothing had changed." Consequently, she was afraid to return to work.
Plaintiff believed that something could have been done under the Veterans' Home code of conduct to move Brown to another facility, though she was not herself familiar with the procedures necessary to remove a resident from the home. While plaintiff was on disability leave, she filed an initial complaint with the Department of Fair Employment and Housing (DFEH), and was issued a right-to-sue letter. She did not pursue that complaint, however, because plaintiffs supervisor had told her that, as a state employee, plaintiff could not sue the employer, a state agency. Plaintiffs superiors also told her that if she pursued legal action, she would be fired. Plaintiff later discovered that she was not legally prohibited from pursuing a sexual harassment complaint against the state. She filed an amended complaint with the DFEH. After receiving a right-to-sue letter, she initiated the instant action.
At trial, the employer's defense strategy was largely to suggest that plaintiff may in fact have had some kind of relationship with Brown, and that Brown became jealous when plaintiff began spending time with Bishop.
In discovery responses, however, the employer admitted that plaintiff had complained of sexual harassment, and that she had called security several times to the clinic regarding disturbances caused by Brown.
The administrator of the Veterans' Home, Thomas Langley, also acknowledged *771 that residents were subject to a code of conduct which prohibited all sorts of disruptive behavior, including sexual harassment. Among other sanctions, a resident may be evicted for misconduct.
Langley was newly assigned to the Veterans' Home during the time that plaintiff experienced difficulties with Brown. Langley testified that, shortly after he began his assignment, plaintiff had complained to him about Brown. Langley advised plaintiff to have no contact with Brown and that, if Brown came to the clinic, plaintiff should leave the area. Brown would be seen by another nurse. Langley called Brown in "to find out his side of the story." Brown maintained that "this was not his fault," and that he believed there was common affection between plaintiff and himself. Langley directed Brown to "cease and [de]sist" from any further contact with plaintiff; "regardless of the circumstances, he was not to speak to or about [plaintiff]." Langley also told Brown that "he was never to go to the clinic without being accompanied except for emergency care," on pain of possible dismissal from the Veterans' Home.
In addition, Langley referred the matter to the staff social worker for treatment of Brown's behavior. The social worker, William Rigole, attempted intervention through individual counseling. Brown told Rigole that he and plaintiff had had an intimate relationship, and that he felt "jilted" when plaintiff stopped talking to him.
Evidence at trial showed that the employer's sole basis for believing that plaintiff had had a sexual relationship with Brown was Brown's statements. In fact, although the only sexual encounter Brown had claimed to have had with plaintiff was one tryst at a motel, the motel had no record of Brown's or plaintiffs occupancy at the motel.
Rigole determined that Brown's conduct toward plaintiff was inappropriate and instituted a "therapeutic contract" with him. Brown continued to be upset and jealous, however; he was preoccupied with plaintiffs supposed relationship with Bishop, and remained "somewhat sexually fixated."
The staff member responsible for the residential building where Brown lived also described Brown's personality characteristics. The residents of the independent living facilities normally were assigned two to a room. Brown, however, never had a roommate for very long. He would complain that his roommate snored, or he would leave the light on, disturbing the roommate's sleep. The roommates always wanted to be moved from Brown's room. On the surface, Brown was friendly enough, but "he didn't mingle amongst the other individuals only because he felt like he was more of an upper class level, and he was residing with lower class residents there." Brown was "a proud, boastful man." The staff member also testified that Brown was angry and jealous over the perceived attention plaintiff was giving to Bishop, rather than spending time with Brown.
Plaintiff's complaint alleged causes of action for sexual harassment, failure to maintain a workplace free from sexual harassment, retaliation, and intentional infliction of emotional distress. The trial court granted the employer's motion for summary adjudication as to the retaliation and intentional infliction of emotional distress claims; the court also dismissed plaintiff's claim for punitive damages.
At trial upon the remaining causes of action, the employer moved for a directed verdict on the basis that the FEHA does not impose liability on employers for third-party (i.e., non-employee) harassment, and that the employer had discretionary immunity *772 under Government Code section 820.2. The court denied the motion for directed verdict.
On a special verdict, the jury found that plaintiff was subjected to hostile environment harassment, the employer knew or should have known of the harassment, and the employer failed to take immediate and appropriate steps to correct the situation. Accordingly, the jury awarded plaintiff $34,788 in economic damages and $150,000 in noneconomic damages. The court entered judgment on the verdict.
The court denied the employer's motion for judgment notwithstanding the verdict (JNOV). The court granted plaintiffs motion for attorney fees.
The employer now appeals.

ANALYSIS
The primary issue presented on appeal is whether an employer may be held liable under the FEHA for the conduct of a client or customer. The employer argues that the statute imposes no such liability. The employer further contends that it was immune from liability, as a governmental agency, for its discretionary decisions in addressing the problem of the alleged harassment by Brown, a client of the Veterans' Home. The employer argues, in addition, that the evidence is insufficient to support the judgment, because there was inadequate proof Brown harassed plaintiff on account of her sex, rather than because of a personal animus arising from a "failed relationship."
The employer essentially iterates the same points in other guises, contending that the trial court erred in instructing the jury and in preparing the special verdict form. That is, the employer argues, the court erred in instructing the jury that the employer could be liable for non-employee harassment, in allowing the jury to review what was a discretionary decision to which immunity should have applied, and in refusing an instruction on a "failed relationship" defense. The employer also argues the court should have given instructions apportioning fault between itself and Brown. The employer urges the special verdict form was inadequate in the same respects as the instructions. Finally, the employer contends the trial court abused its discretion in awarding attorney fees to plaintiff.
We conclude that the FEHA does not impose employer liability for non-employee discrimination and harassment. This issue is dispositive. The judgment must be reversed on that ground. We are thus not called upon to decide the remaining issues: immunity, sufficiency of the evidence, defenses, apportionment, or attorney fees.

I. The FEHA Does Not Impose Employer Liability for Client or Customer Misconduct

A. Standard of Review

The primary issue in the case is one of statutory construction. Statutory construction presents a question of law which this court reviews de novo.[2]

B. Rules of Statutory Construction

The court's "role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.] In determining intent, we look first to the words of the statute, giving the language its usual, ordinary meaning. If there is no ambiguity in the language, we presume the Legislature meant what it said, and the plain meaning of the statute *773 governs. [Citation.]"[3] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose."[4] "[A] construction making some words surplusage is to be avoided."[5]
Application of these rules is sometimes difficult, however. For example, other rules of construction teach that the "'"language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend."'"[6] Thus, "`[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.'"[7]
Our foremost task remains ascertainment of the legislative intent, including consideration of "the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness."[8] We must always give due regard to "the object to be achieved and the evil to be prevented by the legislation."[9]

C. The Parties' Contentions
Plaintiff and the employer each urge that the purpose of the legislation is "clear"; the sources of their reliance are, however, different.
Plaintiff relies upon the expression of intent in the preamble of the FEHA. The uncodified preamble states: "The Legislature finds and declares that it is the existing policy of the State of California to prohibit harassment and discrimination in employment on the basis of any protected classification. Such conduct whether intentional or unintentional is a violation of the civil rights of California citizenry and has been shown to decrease productivity in the workforce. It is the existing policy of the State of California, as declared by the Legislature, that procedures be established by which allegations of prohibited harassment and discrimination may be filed, timely and efficiently investigated, and fairly adjudicated, and that agencies and employers be required to establish affirmative programs which include prompt and remedial internal procedures and monitoring so that worksites will be maintained free from prohibited harassment and discrimination by their agents, administrators, and supervisors as well as by their nonsupervisors and clientele. To further this intent, the Legislature enacts this act." [10]
According to plaintiff, the words of legislative purpose are clear on the face of the enactment. An uncodified preamble is fully part of the statutory law of this state; it is simply uncodified.[11] Under the preamble's statement of purpose, therefore, *774 when Government Code section 12940 (hereafter, section 12940), subdivision (j)(1) (hereafter, section 12940(j)(1)) provides, in part, that it is an unlawful employment practice "[f]or an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person [italics added], because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation, to harass an employee," it means literally what it says: that harassment of an "employee," on the basis of any proscribed animus, by an employer, "or any other person,"presumably including a client or customeris unlawful under the statute.
The employer emphasizes other portions of the FEHA, however, which suggest that employers are not liable for harassment perpetrated by "clientele" or customers. That is, the employer points to the second sentence of section 12940(j)(1), which specifically states: "Harassment of an employee, an applicant, or a person providing services pursuant to a contract by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Italics added.) Thus, the employer may be liable for unlawful harassment of an employee, if the harassment is committed by an employee, other than an agent or supervisor, and if the employer knew about the harassment but failed to take corrective action. The second sentence does not impose liability on an employer for failing to take corrective action concerning known harassment committed by anyone other than another employee.
It is our duty to resolve which of the competing constructions best comports with the language and purposes of the FEHA.

D. The Statutory Language Does Not Make Employers Liable for Sexual Harassment Committed by Clients or Customers
Section 12940(j)(1) states:
"It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, ... [¶] ... [¶]
"(j)(l) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation, to harass an employee, an applicant, or a person providing services pursuant to a contract. Harassment of an employee, an applicant, or a person providing services pursuant to a contract by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment."
Subdivision (k) of section 12940 (hereafter, section 12940(k)) states that it shall be an unlawful employment practice "[f]or an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."
Plaintiff argues that the first and third sentences of section 12940(j)(1), are not qualified by limitation to specific persons. *775 It is an unlawful employment practice for anyone, i.e., an "employer," or "any other person," to harass an employee on the basis of any of the prohibited classifications. The words "any other person," must be taken to include customers and clientele. The duty of an "entity" to take "all reasonable steps to prevent harassment," contained in subdivisions (j)(1)and (k), is likewise not limited by its own terms to the prevention of harassment by any particular person. Thus, plaintiff argues, when the first and third sentences are read together, they impose liability on an employer for failing to prevent harassment by customers and clientele.
Plaintiff's construction fails to place all the sentences of section 12940(j)(1)in proper context, however.
The first sentence of section 12940(j)(1) suggests that liability for harassment may be imposed upon an employer, or upon any similar entity, "or [upon] any other person," for unlawful acts committed by such entity or person directly upon an employee. Thus, even if the first sentence of section 12940(j)(1) is read to make it unlawful for a client or customeri.e., "any ... person"to harass an employee, it is the client or customer alone who bears the responsibility for such acts. Even if the first sentence is read broadly, as plaintiff urges, it simply does not address liability based on the acts of another.
Otherwise, the first sentence would have to be read to impose liability on the employer not only for harassment committed by "any other person," but also for harassment committed by any of the specified entities, such as a labor organization, an employment agency, an apprenticeship training program, and any training program leading to employment. Manifestly, the "plain meaning" of the first sentence is to hold each specified entity or person liable for its own wrongs, not for the wrongs of all or any of the others. Any other reading would render the first sentence confusing, unworkable, and absurd.
The second sentence of section 12940(j)(1), by contrast, does address employer liability for the acts of others. That is, an employer may be liable for unlawful harassment perpetrated by another, but only on account of "an employee other than an agent or supervisor," [12] and, even then, only if two other requirements are met: The employer, or its agents or supervisors, must be on notice of the harassing conduct, and the employer must have failed to respond with corrective action.
The third sentence of section 12940(j)(1) properly refers, then, to the second sentence: An employer must "take all reasonable steps to prevent harassment from occurring," in the limited context under which the employer is liable for harassment committed by another. Although, when read in isolation, the third sentence of section 12940(j)(1) might bear the interpretation which plaintiff desiresi.e., requiring employers to "take steps" to prevent harassment by anyone, including customers and clienteleif such a broad duty had been intended, then the second sentence of section 12940(j)(1) would not have limited liability so strictly for acts committed by others.
Put another way, the second sentence of section 12940(j)(1) sets the conditions for employer liability for harassment by another. It imposes such liability only for a coemployee, and only if the employer both (1) had notice of the coemployee's harassment and (2) failed to take corrective (preventive?) action. If the Legislature had intended to impose broad liability for, and *776 to impose a duty on the employer to prevent harassment by all manner of third parties, including customers and clientele, the second sentence would have included customers and clients within its ambit. It does not do so. The duty to "take all reasonable steps to prevent harassment," then, refers only to the harassment by others for which the employer is liable: only to harassment committed by an employee other than a supervisor or agent. It does not refer to harassment committed by a client or customer.
Our construction of the statutory language is bolstered by the California Supreme Court's decision in Carrisales v. Department of Corrections,[13] There, the question was whether, under the first sentence of section 12940(j)(1), a coemployee could be held individually liable for violation of the FEHA. That is, did the first sentence of section 12940(j)(1) impose direct liability on a coemployee, as "any other person," for the coemployee's harassment of the plaintiff employee? Section 12940 provides that, "[i]t shall be an unlawful employment practice ... [¶] ... [¶] [f]or an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, ... to harass an employee," because of any of the prohibited classes of animus. The California Supreme Court held, nonetheless, that this broad statement does not define a broad scope of personal liability. Rather, the purpose of section 12940 as a whole is to define the constituent elements of an unlawful employment practice. "If there is no proscribed `employment practice,' the FEHA does not apply. The second sentence of section 12940(h)(1) [now section 12940(j)(1)] makes clear what is an unlawful employment practice in this context: `Harassment of an employee or applicant by an employee other than an agent or supervisor ... shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action.' (Italics added.) If an employee other than an agent or supervisor commits the harassment, and the employer takes immediate and appropriate corrective action when it becomes or reasonably should become aware of the conductfor example, when the victim or someone else informs the employerthere simply is no `unlawful employment practice' that the FEHA governs. Additionally, ... `we do not believe the Legislature intended the harassing coworker's liability to turn on the employer's knowledge and failure to take action.' If the employer takes appropriate action, no unlawful employment practice has occurred. If the employer fails to take such action, there may be an unlawful employment practice, but it is by the employer, not the coworker."[14] The California Supreme Court thus did not read even the first sentence of section 12940(j)(1) to impose personal liability for harassment upon a coworker.
Based strictly upon the language of the statute, we cannot discern an intent, implemented by any operative provisions, imposing liability on an employer for harassment committed by the employer's customers or clientele.
Assuming that the language itself is not clear enough to forgo construction, however, we next examine the legislative history to ascertain the legislative intent.

*777 E. The Legislative History Does Not Support a Reading Making Employers Liable for Sexual Harassment Committed by Clients or Customers[15]
If the meaning of a statute is unclear, then reviewing the legislative history may shed some light. When an enactment has undergone amendment, it may be possible to determine what the ultimate statutory language means by a comparison of language that has been rejected, changed, or retained in its final form.[16]
Here, the legislative history of 1984 amendments to section 12940 shows that the Legislature expressly rejected a proposed amendment which would have made an employer liable for harassment by clients or customers. This legislative history supports the conclusion that employers are not liable for harassment committed by clients and customers of the employer.
As originally enacted, the provision which is now section 12940(j)(1) stated: "Harassment of an employee or applicant by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." [17] (Italics added.)
In 1984, an amendment was proposed, as follows: "Harassment of an employee or applicant by an employee any person other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." [18]
Such an amendment to the portion of section 12940(j)(1) imposing liability for the acts of others would necessarily have included clients and customers among those for whom the employer would be liable, but only, as before, if the employer had notice of the harassment and failed to take reasonable curative steps.
The bill was later amended, however to delete the language which would have imposed liability on an employer for harassment by "any person," and to restore the imposition of liability only for nonsupervisory employees: "Harassment of an employee or applicant by any person an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (New language in italics, and deleted language stricken, in original.)
The deletion of "by any person" and replacement with "by an employee," shows that the Legislature had the opportunity to adopt the expanded employer liability, but decided not to do so. The Legislature's deletion of a provision which appeared in an earlier proposed version of a statute constitutes strong evidence that the final *778 statute as enacted should not be construed to incorporate the omitted provision.[19] It is beyond the proper role of this court to add language which the Legislature has expressly rejected. Accordingly, section 12940(j)(1) cannot properly be interpreted to require employers to assume liability for acts of discrimination perpetrated by customers and clientele.

F. Plaintiff's Federal Case Authority Is Inapposite
Plaintiff relied on federal case authority to show that an employer has been held liable for third-party harassment under federal anti-discrimination law.[20] Because, it is urged, the FEHA was modeled on the federal legislation, federal cases should operate as persuasive authority for the proper interpretation of the FEHA.
While it is generally true that the California courts may look to federal decisions construing provisions which have parallels in both the federal and state laws,[21] the employer points out that the provisions of the federal law, upon which the federal courts rely to impose employer liability for customer harassment, have no counterpart in California's FEHA.
The provisions of section 12940, prohibiting harassment based on the listed proscribed biases, were first adopted in 1982.[22] Those provisions derive from an EEOC (Equal Employment Opportunity Commission) regulation, 29 Code of Federal Regulation part 1604.11, as it existed at that time. EEOC regulation, part 1604:11 stated in relevant part:
"(d) With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.
"(e) An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.
"(f) Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring. ..."[23]
*779 The second sentence of section 12940(j)(1) is clearly based upon EEOC regulation, part 1604.11, subdivision (d). The third sentence of section 12940(j)(1), and the statement in section 12940(k), repeat the language of EEOC regulation, part 1604.11, subdivision (f). California's FEHA did not, however, adopt any provision modeled on EEOC regulation, part 1604.11, subdivision (e). Given the close correspondence of section 12940 with the language of the EEOC regulations, the omission of any comparable provision in the FEHA for employer liability for the acts of non-employees, with respect to sexual harassment of employees in the workplace, must be considered a deliberate intent not to include such liability in section 12940. The statutory wording of the FEHA simply does not create employer liability for harassment of employees by clients and customers.
The federal cases upon which plaintiff relies to establish that an employer may be liable for client harassment are based upon federal regulations which have no equivalent in the California state enactment. "While as a general rule the courts have looked to federal decisions under title VII for assistance in interpreting [the] FEHA `where appropriate' [citations], it is not appropriate to follow federal decisions where the distinct language of [the] FEHA evidences a legislative intent different from that of Congress. [Citation.]"[24] Consequently, the federal authorities upon which plaintiff relies are inapplicable, and do not persuade us that the FEHA should be interpreted to impose employer liability for the acts of clients or customers.

G. Section 12940(k) Does Not Support an Independent Cause of Action
The employer argues that the trial court improperly permitted plaintiff, over objection, to state a separate cause of action under section 12940(k), for breach of a statutory duty to prevent harassment from occurring. We agree with the employer that section 12940(k) does not state a separate duty from that provided in the third sentence section 12940(j)(1), and thus will not support a broadly stated cause of action against an employer whenever the employer fails to "take all reasonable steps necessary to prevent discrimination and harassment from occurring," no matter by whom. The construction favored by plaintiff would in effect render employers guarantors against the occurrence of harassment, despite the clearly expressed limitations stated in section 12940(j)(1) upon employers' liability for acts of discrimination perpetrated by others. We are constrained to believe the Legislature intended the various portions of the legislation to be consistent with one another: "provisions relating to the same subject matter must be harmonized to the extent possible."[25]
We note that the California Supreme Court has already interpreted the FEHA not to provide a private right of action of an employee against individual supervisory employees for acts of discrimination,[26] or against individual coemployees for acts of harassment.[27] The Legislature has responded to the holding of Carrisales, to add a new subdivision, section 12940(j)(3), providing: "An employee of an entity subject *780 to this subdivision is personally liable for any harassment prohibited by this section that is perpetrated by the employee, regardless of whether the employer or covered entity knows or should have known of the conduct and fails to take immediate and appropriate corrective action." Notably, however, the Legislature's specification of individual liability for coemployees, in section 12940(j)(3), conspicuously omits clients or customers. The Legislature evidently accepted and accorded to the first sentence of section 12940(j)(1) the construction placed upon it by the California Supreme Court in Carrisales, but remedied the issue by a new enactment.. Accordingly, we can discern no intent to depart from the California Supreme Court's construction of section 12940(j)(1)'s first sentence in the case of clients or customers.
If, as we have determined, section 12940(j)(1) does not impose liability on an employer for harassment committed by a customer or client, it would be absurd to import such liability in section 12940(k), which is nearly identical to the third sentence of section 12940(j)(1). An expansive reading of section 12940(k), beyond that of section 12940(j)(1), would render section 12940(j)(1) superfluous. Plaintiff counters that failing to read section 12940(k) as meaning something more than section 12940(j)(1) effectively renders 12940(k) surplusage.
We disagree. Construing section 12940(k) consistently with section 12940(j)(1) does violence to neither. On the other hand, construing section 12940(k) more broadly than section 12940(j)(1) effectively writes the limitations of section 12940(j)(1) entirely out of the statutory scheme.
We note that, "Express statutory language defining the scope of employer liability is not surplusage. Rather, it may eliminate potential confusion and avoid the need to research extraneous legal sources to understand the statute's full meaning. Legislatures are free to state legal principles in statutes, even if they repeat preexisting law, without fear the courts will find them unnecessary and, for that reason, imbued with broader meaning."[28] The Legislature's repetition of the relevant principles in section 12940(k) was of this sort; it was entitled to do so without fear that the courts would impress a broader meaning upon it, which would defeat other parts of the same legislation.
Accordingly, we believe section 12940(k) must be read in pari materia with section 12940(j)(1), and not as imposing an independently sanctionable duty.

II. The Remaining Issues Need Not Be Decided
The employer has raised numerous other issues, most of which represent iterations of the main issue in different forms, e.g., as instructional error, or as error in the formulation of the special verdict. Our resolution of the primary issue obviates the need to analyze alleged instructional or other error.
In addition, because we have determined that the FEHA does not provide for employer liability for the harassing conduct of its customers or clientele, we need not reach the employer's claim of governmental immunity. Similarly, we need no longer be concerned with the trial court's supposed failure to consider the "failed relationship" defense, or to instruct on apportionment of fault, for purposes of *781 assessing noneconomic damages, between the employer and Brown.
Finally, inasmuch as we must reverse the judgment, plaintiff is not the prevailing party, and the award of attorney fees must also be reversed.

DISPOSITION
The FEHA does not impose a duty on an employer to protect an employee from sexual harassment by a nonemployee. The judgment below, permitting the jury to hold the employer liable for harassment by a customer or clienti.e., a resident of the Veterans' Homewas improper and must be reversed. Accordingly, the attorney fees award in plaintiffs favor must also be reversed. It is so ordered.
Defendant shall recover costs on appeal.
We concur: RAMIREZ, P.J., and KING, J.
NOTES
[1] Military and Veterans Code section 1010, et seq. (see Mil. & Vet.Code, § 1012).
[2] Haas v. Meisner (2002) 103 Cal.App.4th 580, 586, 126 Cal.Rptr.2d 843.
[3] Hunt v. Superior Court (1999) 21 Cal.4th 984, 1000, 90 Cal.Rptr.2d 236, 987 P.2d 705.
[4] Curie v. Superior Court (2001) 24 Cal.4th 1057, 1063, 103 Cal.Rptr.2d 751, 16 P.3d 166.
[5] Watkins v. Real Estate Commissioner (1960) 182 Cal.App.2d 397, 400, 6 Cal.Rptr. 191.
[6] Younger v. Superior Court (1978) 21 Cal.3d 102, 113, 145 Cal.Rptr. 674, 577 P.2d 1014.
[7] People v. Pieters (1991) 52 Cal.3d 894, 899, 276 Cal.Rptr. 918, 802 P.2d 420.
[8] Clean Air Constituency v. California State Air Resources Bd. (1974) 11 Cal.3d 801, 814, 114 Cal.Rptr. 577, 523 P.2d 617.
[9] Harris v. Capital Growth Investors XIV (1991) 52 Cal.3d 1142, 1159, 278 Cal.Rptr. 614, 805 P.2d 873.
[10] Statutes of 1984, chapter 1754, section 1, pages 6403-6404, italics added.
[11] See County of Los Angeles v. Payne (1937) 8 Cal.2d 563, 574, 66 P.2d 658.
[12] Other provisions of the FEHA impose strict liability on the employer for the unlawful discriminatory acts of its supervisors and agents.
[13] Carrisales v. Department of Corrections (1999) 21 Cal.4th 1132, 90 Cal.Rptr.2d 804, 988 P.2d 1083.
[14] Carrisales v. Department of Corrections, supra, 21 Cal.4th 1132, 1135-1136, 90 Cal. Rptr.2d 804, 988 P.2d 1083.
[15] We grant the employer's motion, filed November 12, 2002, to take judicial notice of legislative history documents covering Government Code section 12940. We deny the employer's request to take judicial notice of the transcript of Brown's deposition testimony. We further deny plaintiff's request of November 25, 2002, to take judicial notice of an amicus brief filed by the Attorney Genera) in a case which is now pending before the California Supreme Court.
[16] Slate Farm Mitt. Auto. Ins. Co. v. Haight (1988) 205 Cal.App.3d 223, 236, 252 Cal.Rptr. 162 ["successive drafts" of a pending bill "are helpful in interpreting a statute if it is conceded that the meaning is unclear"].
[17] Statutes of 1982, chapter 1193, section 2, page 4260.
[18] Senate Bill No.2012 (1983-1984 Reg. Sess.).
[19] Central Delta Water Agency v. State Water Resources Control Bd. (1993) 17 Cal.App.4th 621, 634, 21 Cal.Rptr.2d 453.
[20] See, e.g., Coates v. Sundor Brands, Inc. (11th Cir.1999) 164 F.3d 1361, 1366; Lockard v. Pizza Hut, Inc. (10th Cir.1998) 162 F.3d 1062, 1075; Rodriguez-Hernandez v. Miranda-Velez (1st Cir.1998) 132 F.3d 848, 854; Crist v. Focus Homes, Inc. (8th Cir.1997) 122 F.3d 1107, 1110; Folkerson v. Circus Circus Enterprises, Inc. (9th Cir.1997) 107 F.3d 754, 756.
[21] See, e.g., Reno v. Baird (1998) 18 Cal.4th 640, 647, 76 Cal.Rptr.2d 499, 957 P.2d 1333 ["`Because the antidiscrimination objectives and relevant wording of title VII of the Civil Rights Act of 1964 (Title VII) [(42 U.S.C. § 2000e et seq.)] [and other federal antidiscrimination statutes] are similar to those of the FEHA, California courts often look to federal decisions interpreting these statutes for assistance in interpreting the FEHA'"].
[22] Statutes of 1982, chapter 1193, section 2, pages 4258-4260.
[23] 29 Code of Federal Regulations, section 1604.11, effective Nov. 10, 1980.
[24] Page v. Superior Court (1995) 31 Cal. App.4th 1206, 1215-1216, 37 Cal.Rptr.2d 529.
[25] Lungren v. Deukmejian (1988) 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299.
[26] Reno v. Baird, supra, 18 Cal.4th 640, 663, 76 Cal.Rptr.2d 499, 957 P.2d 1333.
[27] Carrisales v. Department of Corrections, supra, 21 Cal.4th 1132, 1140, 90 Cal.Rptr.2d 804, 988 P.2d 1083.
[28] Reno v. Baird, supra, 18 Cal.4th 640, 658, 76 Cal.Rptr.2d 499, 957 P.2d 1333, italics added.